IN THE DISTRCT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**JEFFREY BROOKS** | Criminal No: 6:23cr509<br><br>18 U.S.C. § 1349<br>18 U.S.C. § 981(a)(1)(C)<br>28 U.S.C. § 2461(c)<br><br>**INFORMATION** |

## COUNT 1

THE UNITED STATES ATTORNEY CHARGES:

Introduction

At all times material to this Information:

The Defendant and His Companies

1. **JEFFREY BROOKS** was a resident of the Western District of New York and the beneficial owner and operator of eight durable medical equipment ("DME") companies and a call center.

2. From in or around May 2019 through in or around March 2020, **JEFFREY BROOKS** owned and operated Serenity DME, LLC ("Serenity"). **JEFFREY BROOKS** paid another individual to appear on Medicare and other paperwork as the owner of Serenity.

3. From in or around July 2019 through in or around April 2020, **JEFFREY BROOKS** owned 80% of and operated BracePros, LLC ("BracePros"). **JEFFREY BROOKS'**s ownership interest in BracePros was not disclosed to Medicare.

4. From in or around July 2019 through in or around May 2020, **JEFFREY BROOKS** owned and operated First Due Medical LLC ("First Due"). **JEFFREY BROOKS** paid another

1

individual to appear on Medicare and other paperwork as the owner of First Due.

5. From in or around July 2019 through in or around December 2020, **JEFFREY BROOKS** was a beneficial owner and helped operate Cypress Health Solutions LLC ("Cypress"); yet, another individual appeared on Medicare and other paperwork as the sole owner of Cypress.

6. From in or around October 2019 through in or around February 2021, **JEFFREY BROOKS** owned and operated Advantage Infinity Health LLC ("Advantage Infinity"). **JEFFREY BROOKS** paid another individual to appear on Medicare and other paperwork as the owner of Advantage Infinity.

7. From in or around March 2020 through in or around January 2021, **JEFFREY BROOKS** owned and operated Utopian Health LLC ("Utopian Health"). **JEFFREY BROOKS** paid another individual to appear on Medicare and other paperwork as the owner of Utopian Health.

8. From in or around April 2020 through in or around December 2020, **JEFFREY BROOKS** owned and operated North Point Medical Inc. ("North Point"). **JEFFREY BROOKS** paid another individual to appear on Medicare and other paperwork as the owner of North Point.

9. From in or around May 2020 through in or around December 2020, **JEFFREY BROOKS** owned and operated Sure Care Medical Supplies, LLC ("Sure Care"). **JEFFREY BROOKS** paid another individual to appear on Medicare and other paperwork as the owner of Sure Care.

10. Serenity, BracePros, First Due, Cypress, Advantage Infinity, Utopian Health, North Point, and Sure Care were DME companies and enrolled Medicare providers located in Fort Pierce, Florida (collectively, the "DME Companies").

11.     From in or around May 2020 through in or around December 2020, **JEFFREY BROOKS** was an operator and beneficial owner of Remote Solutions LLC ("Remote Solutions"), a company doing business in Greenville, South Carolina, that operated a call center.

### The Medicare Program

12.     The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"). Individuals who received Medicare benefits were called "beneficiaries."

13.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

14.     Medicare covered different types of benefits that were separated into different parts. Medicare Part B covered, among other things, certain DME. Health care providers and suppliers (collectively, "providers") could submit claims to Medicare only for medically reasonable and necessary items and services that they provided or rendered.

15.     In order to receive payment for covered items and services furnished to Medicare beneficiaries, providers, including DME companies, were required to submit a Medicare enrollment application, CMS Form 855, in which the provider certified its compliance with all Medicare-related laws and regulations, including the Federal Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), which prohibited the offering, paying, soliciting, or receiving of any remuneration in exchange for a patient referral or the referral of other business for which payment could be made by any Federal health care program.  Providers further agreed not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or

reckless disregard of their truth or falsity. If Medicare approved the application, providers were permitted to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

16. In order to maintain active enrollment status, and as a condition of participation in Medicare, providers, including DME companies, were required to report changes in enrollment information that involved any change of ownership or control interest within 30 days of the change. Providers were also required to certify that they did not employ an individual who had been excluded from participation in Medicare.

17. A person with an "ownership or control interest" was defined, with respect to an entity, as a person with a direct or indirect ownership interest of five percent or more, or an officer or director of the entity. A "managing employee" was defined as a general manager, business manager, administrator, director, or other individual that exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operation of the provider, either under contract or through some other arrangement, whether or not the individual was a W-2 employee of the provider.

18. For certain types of providers, including DME companies, the application to enroll in Medicare or make changes to enrollment was known as Form CMS-855S. Among other information, Form CMS-855S contained spaces for a provider to identify persons who have five percent or greater direct or indirect ownership interest, all managing employees, all individuals with a partnership interest in the provider, and authorized and delegated officials.

19. Certain providers, including DME companies, were required to resubmit and recertify the accuracy of their enrollment information every three years. Among the types of information required to be provided were changes in ownership interest and/or managing control,

including listing individuals who were five percent or greater direct/indirect owners, authorized or delegated officials, partners, directors/officers, contracted managing employees, and managing employees.

### DME Claims Submitted under Medicare Part B

20. DME was reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

21. To receive reimbursement from Medicare for DME, a DME company was required to submit a claim, either directly or through a billing company. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Claim forms required information, including the identity and Medicare number of the Medicare beneficiary, the item provided, and the identity and National Provider Identifier number of the referring physician.

22. To bill Medicare for DME, the DME was required to be reasonable and medically necessary, ordered by a licensed provider, and actually provided to the beneficiary. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### The CHAMPVA Program

23. The Civilian Health and Medical Program of the Department of Veterans Affairs program ("CHAMPVA") was a comprehensive health care program in which the Department of Veterans Affairs ("VA") shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA provided coverage to the spouse or widow(er) and to the children of veterans who had been rated permanently and totally disabled for a service-connected disability, and to the surviving spouses or children of veterans who died from VA-rated service-connected disabilities. In general, CHAMPVA covered most health care services and supplies that were

medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must first have been sent to Medicare for processing, after which Medicare electronically forwarded claims to CHAMPVA. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

24. CHAMPVA was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

Conspiracy

25. From in or around May 2019, and continuing through in or around December 2020, in the District of South Carolina and elsewhere, the Defendant, **JEFFREY BROOKS**, knowingly and intentionally combined, conspired, confederated, and agreed with others to knowingly and willfully devise and execute a scheme and artifice to defraud health care benefit programs affecting commerce, that is, Medicare and CHAMPVA, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

Purpose of the Conspiracy

26. It was a purpose of the conspiracy for **JEFFREY BROOKS** and others to unlawfully enrich themselves by, among other things: (a) offering and paying kickbacks and bribes in exchange for signed doctors' orders for braces; (b) submitting and causing the submission of false and fraudulent claims to Medicare for braces that were ineligible for Medicare reimbursement

and medically unnecessary; (c) concealing and causing the concealment of kickbacks and bribes and false and fraudulent claims; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

Manner and Means of the Conspiracy

27.     The manner and means by which **JEFFREY BROOKS** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

    a.     **JEFFREY BROOKS** owned and controlled Serenity, BracePros, First Due, Cypress, Advantage Infinity, Utopian Health, North Point, Sure Care, and Remote Solutions.

    b.     **JEFFREY BROOKS** paid other individuals to appear on the Form 855 and other paperwork as the owners of Serenity, First Due, Cypress, Advantage Infinity, Utopian Health, North Point, and Sure Care.

    c.     **JEFFREY BROOKS** and others submitted or caused the submission of false and fraudulent enrollment documentation to Medicare that concealed and disguised **JEFFREY BROOKS'** ownership and/or managing control of Serenity, BracePros, First Due, Cypress, Advantage Infinity, Utopian Health, North Point, and Sure Care.

    d.     **JEFFREY BROOKS** and his co-conspirators purchased Medicare beneficiaries' personally identifiable information ("PII") and purported personal health information ("PHI") from third-party call centers to generate doctors' orders for braces.

    e.     Beginning in or around December 2020, **JEFFREY BROOKS** and his co-conspirators at Remote Solutions contacted Medicare beneficiaries,

including Medicare beneficiaries located in the District of South Carolina, and induced the Medicare beneficiaries to provide their PII and PHI and to agree to accept braces regardless of medical necessity.

f. **JEFFREY BROOKS** and his co-conspirators paid a purported telemedicine company illegal kickbacks and bribes to obtain a medical practitioner's signature on the doctors' orders, regardless of medical necessity, including for beneficiaries residing in the District of South Carolina.

g. **JEFFREY BROOKS** and his co-conspirators concealed and disguised the nature and source of the kickbacks and bribes by creating and causing the creation of false invoices that falsely identified the payments as being for marketing and consulting hours, when in reality **JEFFREY BROOKS** was purchasing doctor's orders.

h. **JEFFREY BROOKS**, through the DME Companies, used the doctors' orders to cause the submission of false and fraudulent claims to Medicare, including claims on behalf of Medicare beneficiaries residing in the District of South Carolina.

i. From in or around May 2019 through in or around December 2020, the DME Companies owned and operated by **JEFFREY BROOKS** submitted false and fraudulent claims to Medicare in the approximate amount of $29.6 million that were procured by the payment of illegal kickbacks and bribes, medically unnecessary, and ineligible for reimbursement. Medicare paid approximately $15.2 million on those false and fraudulent claims.

  j. From in or around May 2019 through in or around December 2020, CHAMPVA paid approximately $22,795.58 on the false and fraudulent claims.

  k. Money received from Medicare and CHAMPVA by the DME Companies was transferred to **JEFFREY BROOKS** through bank accounts in the name of Remote Solutions and another entity owned and controlled by **JEFFREY BROOKS**.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

A. <u>CONSPIRACY</u>:

Upon conviction for violation of Title 18, United States Code, Section 1349 (conspiracy to violate Title 18, United States Code, Section 1347) as charged in this Information, the Defendant, **JEFFREY BROOKS**, shall forfeit to the United States any property, real or personal, constituting, derived from or traceable to proceeds the Defendant obtained directly or indirectly as a result of this offense.

B. <u>SUBSTITUTE ASSETS</u>:

If any of the property subject to forfeiture, as a result of any act or omission of the Defendant –

  (a) cannot be located upon the exercise of due diligence;
  (b) has been transferred or sold to, or deposited with, a third person;
  (c) has been placed beyond the jurisdiction of the Court;
  (d) has been substantially diminished in value; or
  (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the Defendant up to the value of the above described forfeitable property;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

s/Amy F. Bower
By: Amy F. Bower, Id No. 11784
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
Telephone:  (843) 727-4381
Facsimile:  (843) 727-4443
Email:  amy.bower@usdoj.gov

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION

s/Catherine Wagner
By: Catherine Wagner
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1000 Louisiana Suite 2300 Houston, Texas 77002
Telephone: (713) 567-9515
Email: Catherine.Wagner@usdoj.gov